**PACKERWARE CORPORATION,**
Plaintiff,

v.

**CORNING CONSUMER PRODUCTS COMPANY, Defendant.**

Civ. A. No. 95–2153–EEO.

United States District Court,
D. Kansas.

July 14, 1995.

Richard R. Johnson, Devon A. Rolf, Kokjer, Kircher, Bowman & Johnson, Kansas City, MO, for plaintiff.

Thomas H. Van Hoozer, Robert D. Hovey, Hovey, Williams, Timmons & Collins, Kansas City, MO, Marie V. Driscoll, Robin, Blecker, Daley & Driscoll, New York City, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on plaintiff's application for preliminary injunction (Doc. # 5). Plaintiff PackerWare Corporation filed this action against defendant Corning Consumer Products Company claiming trademark infringement. Plaintiff seeks to enjoin defendant from using the term "Casual Elegance" with its new product line. After carefully considering the parties' briefs, oral arguments, testimony at the hearing, and exhibits, the court makes the following findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I. *Findings of Fact*

1. Plaintiff, PackerWare Corporation (hereinafter plaintiff or PackerWare), is a Kansas corporation with its principal place of business in Lawrence, Kansas. It was formerly known as Packer Plastics Incorporated.

2. Corning Consumer Products Company (hereinafter defendant or Corning) is a Delaware corporation with its principal place of business in Corning, New York.

3. The plaintiff is in the business of manufacturing and selling articles made of plastic. Until 1991, when plaintiff decided to develop a retail line, its business was primarily the manufacture of plastic containers used by the food industry for packaging dairy products such as margarine, yogurt, and Cool Whip. It has also manufactured printed cups which are sold to consumers, primarily at athletic events.

4. Corning Consumer Products Company is a wholly-owned subsidiary of Corning Incorporated, which is a leading manufacturer and distributor of products made of glass and other materials for industrial, scientific, and household use. The Corning Consumer Products subsidiary was formed to sell cookware, which is identified by brands such as Corning, Corelle, Corning Ware, Pyrex, Visions and Revere.

5. In 1991, PackerWare decided to develop a retail line, which was to include brightly colored plastic pitchers, cups, tumblers,

plates, and bowls. Prior to 1991, the plaintiff had not focused on retail products. Packer-Ware named its new line "Casual Elegance."

6. On December 1, 1992, PackerWare registered Casual Elegance as a trademark in the United States Patent and Trademark Office, under Registration No. 1,737,656. The goods covered by the registration are "plastic dinnerware."

7. The PackerWare Casual Elegance product line includes tumblers, bowls, plates, and pitchers, which are all made of plastic. Items such as tumblers, bowls, and plates are available at retail stores in shrink wrap sets.

8. A PackerWare 1995 Price List indicates that the sets of PackerWare Casual Elegance tumblers are priced from $0.78 to $1.32 per set; pitchers are listed at $1.69, fluted bowls are priced at $1.16 and $1.62 per set, and fluted plates are priced at $2.02 for a set of four. James Schwartzburg, Packer-Ware's chief executive officer, testified that a set of three tumblers retails at approximately $1.

9. The PackerWare plastic products are sold primarily in retail stores of mass merchandisers such as Wal–Mart and Family Dollar.

10. One of the marketing objectives listed in the PackerWare Marketing Plan is "[t]o tie Casual Elegance to the PackerWare name, capitalizing on the strength and reputation of PackerWare for top quality, value-added merchandise."

11. James H. Schwartzburg, founder and chief executive officer of PackerWare, testified that it is the goal of the company to use the PackerWare name wherever possible in connection with the PackerWare product. He also testified that the marketing objective of tying Casual Elegance to the PackerWare name was being carried into effect.

12. No consumer print advertisements for the PackerWare Casual Elegance line were introduced into evidence, and Mr. Schwartzburg could not recall whether such advertisements had ever been placed.

13. Bruce Sims, Vice–President, Sales, of PackerWare, first learned of PackerWare's Casual Elegance product line in 1993, when he was approached by someone from Packer-Ware regarding a possible job opportunity with the company. Prior to meeting with PackerWare, Sims had never heard of the Casual Elegance product, although he had been employed in the plastics industry for approximately seven years.

14. In the past, sets of tumblers have been by far the largest selling items in the PackerWare line. For example, in 1993, tumblers accounted for over $800,000 of some $946,000 in total sales. In 1994, tumblers accounted for approximately $1,068,000 of some $1,349,000 in total sales. Items such as plates have had very small sales, with only $2,066 sold in 1993, and $368 in 1994.

15. Between 1992 and 1993, sales of PackerWare Casual Elegance products dropped significantly because the plaintiff experienced manufacturing problems with the molds.

16. Prototypes of a plastic salad bowl set and a plastic pitcher and tumbler set were made, but these products have not been sold because of production problems with the packaging. PackerWare has also experienced problems with the mold for plates.

17. Schwartzburg testified that Packer-Ware originally intended to extend its Casual Elegance line into new types of products other than plastic, such as tablecloths, ceramics, and stoneware. PackerWare, however, has not in fact begun to sell such products in the four years since the Casual Elegance line was introduced. Mr. Schwartzburg could not recall what, if anything, PackerWare had ever sold in any product line that was not made of plastic.

18. Schwartzburg admitted that he was unable to show any lost sales of PackerWare Casual Elegance products attributable to Corning. He also admitted that Packer-Ware's product is not a substitute for Corning's products made of Pyroceram glass ceramic.

19. The Corning cookware at issue in this proceeding is made of Pyroceram, a unique glass-ceramic material, which is highly resistant to breakage and temperature extremes. Corning Incorporated invented the material

in 1956 for use in the nose cones of guided missiles.

20. The Pyroceram material subsequently was adapted to a line of commercial cooking and serving vessels introduced to the public in 1958 under the trademark Corning Ware. The Corning Ware cookware has been a successful product line, with sales since 1958 exceeding $1.9 billion. Defendant has spent over $100 million in advertising and promotion. More than 440,000,000 pieces of Corning Ware has been sold since its introduction.

21. Corning Ware cookware is the leader in market share in the oven cookware category. Market research indicates that 72% of the households in this country own Corning Ware products, and that 91% of those owners are extremely or very satisfied with them. Market research also shows that the Corning Ware trademark has a high consumer awareness of 98%. Schwartzburg has admitted that the Corning Ware trademark is "definitely" well known.

22. This action concerns use by Corning of the term Casual Elegance on a new style of Corning Ware cookware and serveware. Corning Ware had previously been available in two styles, its original, traditional version called A-line and a classic style added later which Corning calls French White. In the mid–1980's, Corning introduced to the Pyrex line of bakeware and serveware a style called Clear Elegance. Sales of Clear Elegance have exceeded $8.7 million. From approximately 1987 to 1988, Corning also sold a line of Corning Ware cookware under the style name Classic Elegance. Sales of Classic Elegance products exceeded $5.5 million. Corning has generated significant revenues through the sales of products associated with the concept of "elegance."

23. Corning Ware has been generally considered a product of traditional styling, quality, and durability. Members of the trade had begun to feel that Corning was not responsive to current customer trends. Corning decided to update its image and meet these concerns of the trade by adding a new style designed to appeal to younger customers with more ethnic diversity. Corning decided that, in keeping with the lifestyle enjoyed by the targeted customers, the style would be called Casual Elegance.

24. The new line features new shapes for the cookware, with wider rims, floral embossing, and an ergonomically designed glass cover for easy gripping.

25. The cookware in the new style is manufactured from Corning's unique Pyroceram material. Corning advertising and promotional materials emphasize that the product can withstand extreme changes of temperature, with the capability to go from the cold of a refrigerator or freezer to the heat of an oven or stove top without breaking. Advertising and promotional material also emphasize the Corning and Corning Ware names.

26. The name Corning or Corning Ware appears on each product in the line. The words "Casual Elegance" also appear on all the packaging. Although the plaintiff introduced a document at the hearing showing line drawings of defendant's product referring only to Casual Elegance and not the name Corning or Corning Ware, the document was an internal document only, and not distributed to the trade or given to consumers.

27. In connection with the introduction of the new product to the trade, Corning emphasized its heritage by associating the Casual Elegance line with other Corning brands such as Corning, Corelle Corning Ware, Pyrex, Visions, and Revere. This association with previous Corning products was also made on the back of the packaging of the Casual Elegance product that reaches the consumer at retail.

28. Corning Ware Casual Elegance products were introduced to major Corning accounts in November 1994, and launched at a major Housewares Show in January 1995. All of the retailers to whom the new style was shown accepted all or part of the items in the line for distribution.

29. In January 1995, Corning began shipping Corning Ware Casual Elegance products to its retail customers. The products appeared in retail stores that same month. Corning estimates that as of June 1, the

products had been shipped to 10,000 retail locations. Advertisements for Corning Ware Casual Elegance have appeared in such magazines as Bridal Guide, Family Fun, and Family Circle. Television commercials featuring the product have appeared on prime time, daytime, and cable shows.

30. Clark Kinlin, Vice–President, Marketing, of Corning Consumer Products Company, testified that as of June 1, 1995, approximately four to six million dollars worth of Casual Elegance products were in the field, and that the products had been shipped to 10,000 retail locations.

31. Casual Elegance products are principally sold in department stores, specialty shops, mass merchandisers such as Wal–Mart and Kmart, and through catalog showrooms such as Best Products and Service Merchandise.

32. The price of Corning Ware Casual Elegance is approximately $12.99 to $27.99 per piece, with sets priced from $24.99 to $89.99. Some stores discount these prices.

33. Schwartzburg testified that he thought he had seen a five-piece set of Corning Ware Casual Elegance cookware at Wal–Mart selling at retail for $9.97. Kinlin, however, testified that there is no Corning Ware Casual Elegance product selling at Wal–Mart at the $9.97 price point. Kinlin testified that the least expensive item at Wal–Mart is a one and one-half quart oval roaster that retails for $12.97. This is an open stock item, not a collection of multiple pieces. Kinlin stated that the lowest retail price for a five-piece set would be in the $25 to $29 price range.

34. The price points of Corning Ware products differ from the price points of PackerWare's plastic plates, dishes, and tumblers.

35. Kinlin testified that common industry practice fundamentally separates cookware from dinnerware in point of sales analysis, merchandising, market research, and trade and consumer communications. In addition, plastic does not have the same thermal or other unique properties of the Pyroceram material, and cannot be used for all of the same purposes.

36. The products of PackerWare and Corning are both sold in Wal–Mart stores. Schwartzburg testified that he had observed Corning's Casual Elegance in the aisle directly behind the PackerWare product. Quinton Schonewise, national sales manager for plaintiff, testified he had observed Corning's Casual Elegance in Wal–Mart stores within eight to ten feet of Packer's products.

37. Wal–Mart has reported to Corning that, as of August 12, 1995, it will dedicate sixteen feet of aisle space to products in the bakeware/prepware category. Corning will occupy eight of the sixteen feet, with three Corning Ware collections, A-line, French White, and Casual Elegance. Until that date, Corning Ware Casual Elegance will be shelved in "end caps" or promotional areas.

38. Although Schwartzburg testified that he believed Corning had at one time sold plastic dinnerware, he was unable to provide specific details. Plaintiff submitted no affidavits, exhibits, or other evidence to support Schwartzburg's assertions. Kinlin testified that Corning does not sell plastic dinnerware, and, to his knowledge, never had.

39. The labeling and packaging of the Corning and PackerWare products is very different. The Corning Casual Elegance line is packaged in boxes, with a photograph on the box featuring the cookware, whereas the PackerWare plastic products are shrink-wrapped, with turquoise and purple lettering on cardboard labels.

40. Corning performed a trademark search prior to using the Casual Elegance name. The PackerWare registration for the mark for use on plastic dinnerware was one of the marks shown in the search.

41. In 1994, Corning filed an application with the United States Patent and Trademark Office, seeking to register "Casual Elegance" for use on non-electric cookware. In an initial Examiner's action, the registration was refused on the ground that the mark was likely to cause confusion, mistake, or deception with PackerWare's registered mark.

42. Corning's attorney represented at the hearing for preliminary injunction that at the time the Examiner issued its decision, the Examiner did not have before him the actual

products or their respective packaging and labeling; the Examiner merely compared the trademarks covered in the registration and application, and the description of the goods in both. Additionally, Corning's attorney represented to the court that at the time of the Examiner's decision, the Examiner did not know: (1) that the product seeking registration was a Corning Ware product with the name Corning Ware on the product; (2) the channels of trade; (3) the price points; (4) that in actual use the plaintiff's product has its mark PackerWare on the Casual Elegance product; and (5) how different the products look at point of sale.

43. Corning's attorney represented that it has asked the trademark office to suspend action on the application pending the decision of the court in this proceeding.

44. Lenox, a leading manufacturer of china in the United States, has, since 1992, sold a line of china, including plates, bowls, platters, cups, and various serving pieces, which it calls Casual Elegance. In 1992, Lenox informed PackerWare that it intended to use the name Casual Elegance. Lenox began use and has claimed that PackerWare orally agreed to its use, although PackerWare denies that it did in fact consent. A letter from PackerWare's attorney to Lenox dated February 21, 1995, indicates that PackerWare at least entertained the idea of licensing Lenox to continue using the Casual Elegance mark. Schwartzburg confirmed the content of this letter.

45. Schwartzburg testified that he did not check or follow up with Lenox to see if it was using the name Casual Elegance, and he did not have anyone check in the marketplace to determine whether Lenox was in fact using the name on its products.

46. There is no evidence that Corning acted in bad faith, or that it intended to or has traded on the reputation and goodwill of the plaintiff.

47. When questioned about the effect Corning's use of the Casual Elegance mark would have on PackerWare's Casual Elegance product line, Schwartzburg testified:

I think it would be devastating. I think there would be a lot of confusion in the marketplace. I would think that people would think PackerWare was owned by Corning and I just think it would totally destroy the association with our trademark with our company.

When asked whether plaintiff would continue to sell its Casual Elegance line, he stated,

I don't know. We would have to ... I think it would be destructive. I think we would have a lot of problems.

48. Bruce Sims, Vice–President of Sales for PackerWare, testified regarding the impact of Corning's Casual Elegance advertising campaign on PackerWare:

I think it would be safe to say that it is very possible that a consumer of the Corning Casual Elegance could think that our Casual Elegance is owned by them.

49. Kinlin testified that if a preliminary injunction were to issue enjoining Corning's present advertising campaign, there would be both short and long term consequences for Corning. He stated that in the short term, Corning stood to lose four million dollars of advertising investment. Kinlin testified that if the name were changed, retailers would demand and would receive substantial markdowns on those products to get them off their shelves. Consequently, Corning would incur losses of over five million dollars in "markdown money," or losses incurred from markdowns of 80 to 100 percent of the value of the product once it became a discontinued item. Finally, Corning would have to spend one half million to one million dollars to destroy existing packaging material and to redesign new packaging material and commercials. Kinlin further testified that he believed the most significant impact would be the losses incurred over the long-term. He noted that if an injunction were to issue that prevented Corning's advertisement, promotion, and sale of Corning Ware Casual Elegance cookware, Corning would suffer incalculable damage to its reputation and severe financial loss. Specifically, he noted that Corning would experience a loss of commitment on the part of the trade to support future launches of Corning product lines.

50. According to Corning, this product line is the company's most important new

product launch in ten years. Kinlin testified that the success of the product launch is essential if Corning is to re-establish its credibility with the retail trade as a company that is innovative and able to identify and satisfy consumer trends.

51. Additionally, Corning presented evidence that, when a new line such as the Corning Ware Casual Elegance is introduced, merchandisers allot scarce shelf space, plan promotions, and assign valuable advertising space in their circulars. Kinlin contended that a disruption of marketing at this point could result in the inability of Corning to find merchandisers willing or able to make this effort again. He testified that if the Corning Ware Casual Elegance had to be replaced with another product, he was not confident that the trade would accept the replacement. Kinlin also testified, based on past history at Corning, that it takes the trade two or three years to regain confidence in a manufacturer who has experienced problems with a product line.

52. Kinlin testified that, in 1994, sales of Corning Consumer Products Company exceeded $600 million, and that the company could respond in money damages were the court to find defendant somehow liable to the plaintiff in this action.

53. We find that plaintiff has failed to establish that Corning's use of the Casual Elegance name for its product line will likely result in confusion, mistake, or deception in the marketplace. Plaintiff has also failed to demonstrate a likelihood of reverse confusion.

## II. *Discussion and Conclusions of Law*

In the complaint, plaintiff alleges claims for: (1) infringement of a federally registered trademark under § 32 of the Federal Trademark Act, 15 U.S.C. § 1114(1)(a); (2) common law trademark infringement; (3) false designation of origin under § 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a); and (4) common law unfair competition, all arising from the defendant's use of the designation Casual Elegance in connection with the sale of its Corning Ware ovenware and serveware.

This court has jurisdiction pursuant to 28 U.S.C. § 1338(a) and (b), 15 U.S.C. § 1121, and the doctrine of supplemental jurisdiction. Venue lies pursuant to 28 U.S.C. § 1391.

The main purpose of a preliminary injunction is to preserve the status quo pending a final resolution of the matter during the pendency of an action. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). In order to be entitled to a preliminary injunction, a plaintiff must demonstrate: (1) it will suffer irreparable injury unless the preliminary injunction issues; (2) the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause to defendant; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is substantial likelihood that plaintiff will eventually prevail on the merits. *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986) (citing *Lundgrin,* 619 F.2d at 63).

A preliminary injunction is an extraordinary remedy that is the exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). Because of its extraordinary nature, the right to relief must be clear and unequivocal. *Wilson v. Bruce,* 816 F.Supp. 679 (D.Kan.1993). *See also Penn v. San Juan Hosp., Inc.,* 528 F.2d 1181, 1185 (10th Cir.1975) (party seeking preliminary injunction must make its case not by mere allegations, but by clear proof).

The decision to deny injunctive relief is within the sound discretion of the trial court and will be set aside only if the ruling is based on an error of law or constitutes an abuse of discretion. *Kenai Oil and Gas, Inc. v. Dep't of Interior,* 671 F.2d 383, 385 (10th Cir.1982).

The Tenth Circuit has adopted a modified interpretation of the "likelihood of success" requirement. If the first three requirements for a preliminary injunction are satisfied, then the movant can establish the fourth requirement, likelihood of success, by merely showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litiga-

tion and deserving of more deliberate investigation. *City of Chanute v. Kansas Gas and Electric Co.,* 754 F.2d 310 (10th Cir.1985); *Otero Sav. & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275 (10th Cir.1981).

■ For the reasons stated below, the court concludes that plaintiff has not met this burden and has not established its right to preliminary injunctive relief. Because we conclude that plaintiff has failed to establish that there is a substantial likelihood that it will succeed on the merits even under this circuit's modified interpretation, *City of Chanute, supra,* the first three requirements necessary to warrant preliminary injunctive relief need not be addressed. To the extent we would consider the first three requirements, however, we would conclude that the plaintiff has failed to meet its burden as to these requirements as well.

### A. Likelihood of Success on the Merits— Trademark Claims

■ "A trademark is a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others." *Educational Dev. Corp. v. Economy Co.,* 562 F.2d 26, 28 (10th Cir.1977). Infringement of a trademark occurs when the use of a similar mark is likely to cause confusion in the marketplace concerning the source of the different products. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 940 (10th Cir.1983) (*Beer Nuts I* ).

It should be noted at the outset that this is not a conventional trademark infringement case, where customers mistakenly think that the second, or junior, user's goods are from the same source as or are connected with the first, or senior, user's product. 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.01(5), at 21 (3d ed. 1992). Instead, this case involves the concept of reverse confusion. "Reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user." *Id.*

Plaintiff contends that Corning's planned advertising campaign "will cause Packer's Casual Elegance trademark to become associated with Corning in the minds of consumers, and consumers will thereafter believe mistakenly that Packer's Casual Elegance products are Corning products, or that Packer is owned by Corning." Plaintiff maintains that it has provided "compelling proof" that because Corning has made use of Packer's Casual Elegance mark on Corning products that are closely related to Packer's products, and because of Corning's extensive advertising, "reverse confusion is not only likely but inevitable."

Plaintiff bases its trademark claims on sections 32(1) (trademark infringement) and 43(a) (false designation of origin) of the Federal Trademark Act, 15 U.S.C. §§ 1114(1), 1125(a) (the Lanham Act).

Section 32(1) imposes liability on any person who shall, without the trademark registrant's consent, "use in commerce a reproduction, counterfeit, copy, or colorable imitation of a registered mark ... likely to cause confusion, or to cause mistake or to deceive...."

> Section 43(a) provides in pertinent part: Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

■ Although section 43(a) is broader in scope than section 32(1) because it does not require trademark registration, it still has the common purpose of preventing consumer confusion regarding the source of a product. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987).

■ Plaintiff must first establish that its marks are valid and protectable. Defendant does not contest the validity of plaintiff's mark. Indeed, the facts establish that plaintiff registered its trademark with the Patent

and Trademark Office on December 1, 1992. Accordingly, the court concludes that plaintiff's mark is valid and protectable under the Lanham Act. For the purposes of this motion, the court finds it unnecessary to categorize plaintiff's mark as generic, descriptive, suggestive, or arbitrary. *Beer Nuts I* at 939.

■ To succeed on its infringement claims under sections 32(1)(a) and (b) of the Lanham Act, plaintiff must demonstrate that Corning's use of the term "Casual Elegance" creates a likelihood of confusion on the part of an appreciable number of ordinary purchasers. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987). This "likelihood of confusion" test is also applicable to plaintiff's claim of false designation of origin pursuant to section 43(a) of the Lanham Act, and its common law claims of infringement and unfair competition. *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir. 1984). "Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (1987) (quoting *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 564, 107 S.Ct. 2971, 2995, 97 L.Ed.2d 427 (1987) (Brennan, J., dissenting)). Likelihood of confusion is "considered not only in the context of confusion of source, but also in the context of confusion that results from a mistaken belief in common sponsorship or affiliation." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d at 558.

■ In determining plaintiff's probable success in showing the likelihood of confusion between the PackerWare and Corning marks, the court must examine the following factors: degree of similarity; intent of Corning in adopting the designation; the relation in use and manner of marketing between the goods or services marketed by Corning and those marketed by the plaintiff; and the degree of care likely to be exercised by purchasers. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986) (*Beer Nuts II* ). This list is not exhaustive, other factors such as actual confusion and the strength of the mark may also be considered. *Universal Money Centers, Inc. v. AT & T*, 22

F.3d 1527, 1530 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*, 724 F.Supp. 808, 815 (D.Kan.1989). All of the factors are interrelated, and no one factor is dispositive. *Beer Nuts II*, 805 F.2d at 925. For example, only a small degree of similarity between two marks is necessary for a finding that confusion is likely where the products are identical and inexpensive. On the other hand, highly similar marks may not generate confusion as to the source of the products where the products are very different or relatively expensive. *Id.* The party alleging infringement has the burden of proving likelihood of confusion. *Jordache Enterprises*, 828 F.2d at 1484 (citing *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985)). Categorizing plaintiff's claim as "reverse confusion" does not change plaintiff's burden of proof. For both direct and reverse confusion claims, the test of infringement is likelihood of confusion. *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 554 (N.D.Ill.1984).

In determining whether a likelihood of confusion exists, the court has carefully examined each of the factors enunciated in *Beer Nuts II* and *Universal Money Centers*. The court will consider each of these factors in turn.

### 1. *Similarity of the Marks*

■ In general, the degree of similarity of two marks is tested on three levels as encountered in the marketplace: sight, sound, and meaning. *Beer Nuts I*, 711 F.2d at 940. In considering the characteristics of the marks, similarities weigh more heavily than differences. *Id.* The appearance of the two marks is relevant in assessing the degree of similarity between the marks. *Id.* (citing *Restatement of Torts* § 729 (1938)). In evaluating similarity, the court must not engage in a side-by-side comparison. *Id.* Rather, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Id.* Although each mark is to be considered as a whole, the dominant portion of a mark, if

any, is entitled to greater weight in evaluating the likelihood of confusion. *Continental Scale Corp. v. Weight Watchers Int'l,* 517 F.2d 1378, 1381–82 (C.C.P.A.1975). The dominant portion of a mark is that which is most noticeable and most unavoidably attracts the public's attention. *Gaston's White River Resort v. Rush,* 701 F.Supp. 1431, 1438 (W.D.Ark.1988). The court must analyze each feature of a mark to determine its significance to the mark as a whole and to ascertain the dominant feature of the mark. *Id.* at 1437–38.

■ Plaintiff asserts that because both plaintiff and Corning are using the term "Casual Elegance," the marks are identical and that fact alone "ends the comparison of the marks." The court does not agree. While the terms may be identical, that does not end the inquiry. First, the court finds that the dominant portion of each mark is different. With respect to Packer's mark, the court finds that the word "Casual" is the dominant portion of the mark, as the word "Casual" on the product labeling is approximately three times the size of the word "Elegance." In contrast, the product labeling for the Corning cookware shows both words the same size; hence, no word is dominant.

Second, the court notes that there are significant differences in the overall design of the two products' labeling, specifically with respect to the lettering styles and color schemes. The products are also packaged differently: plaintiff's products are shrink wrapped, whereas defendant's are sold in corrugated cardboard boxes. These differences militate against any likelihood of confusion. *See, e.g., W.W.W. Pharmaceutical Co. Inc. v. The Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993) (differences in product sizes, logos, typeface and package designs created "dissimilar modes of presentation" which made confusion less likely); *Beatrice Foods Co. v. Neosho Valley Creamery Ass'n,* 297 F.2d 447, 450 (10th Cir.1961) (differences in design and color of packaging made confusion unlikely although the products "are sold from the same shelves in the same stores").

Third, the court finds that the marks are not confusingly similar in light of the distinctive Corning Ware house mark prominently displayed either closely above, below, or to the side of the Casual Elegance mark, and in light of the emphasis placed on the Corning Ware name in the product advertisements. Likewise, plaintiff's house mark is prominently displayed on its labeling, in close proximity to the term Casual Elegance. *See Universal Money Centers,* 22 F.3d at 1531. *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981) (affirming summary judgment for defendant Polaroid in part because Polaroid's logo was clearly displayed on its products and advertising). In sum, the differences between the marks significantly outweigh any similarities.

■ Plaintiff concedes that decisions of the United States Patent and Trademark Office are not legally binding on this court. Notwithstanding, plaintiff argues that the Patent and Trademark Office's rejection of Corning's application for registration of the name Casual Elegance on the basis of likelihood of confusion is persuasive authority that the court should consider. In response, defendant urges the court to accord little weight to the trademark office's decision, noting that the determination was a first-office action to which defendant has not had the opportunity to respond, and that the trademark office cannot decide issues of use of a trademark, but only issues of registrability. In addition, defendant observes that the trademark examiner did not have any of the evidence now before the court, such as the specific products; the packaging which displays the house mark Corning Ware on all Corning products; and evidence of the price points. The court finds this situation similar to that in *Accu Personnel, Inc. v. AccuStaff, Inc.,* 823 F.Supp. 1161, 1164–65 (D.Del.1993), and concludes that the determination of the Patent and Trademark Office is of little probative value.

### 2. Intent of Corning in Adopting the Term "Casual Elegance"

■ In a traditional trademark infringement case, "[i]ntent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion...." *Beer Nuts I,* 711 F.2d at 941

(quoting *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980)). In reviewing the intent of a party in selecting a mark, the focus is on whether the party intended to deceive the public and derive benefit from a mark already established in the marketplace. *Jordache Enterprises*, 828 F.2d at 1485.

However, in a reverse confusion case, the problem is that the first user's goods will likely be mistaken for those of the second user. "In a reverse confusion case, of course, the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product. Thus, the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case." *Sands, Taylor & Wood v. Quaker Oats*, 978 F.2d 947, 961 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

■ Nevertheless, plaintiff argues that Corning's "callous disregard" of Packer's registered trademark weighs in favor of Packer on the merits. The court finds that plaintiff has offered no evidence to prove or even suggest bad faith on the part of Corning. Plaintiff appears to ask the court to infer bad faith from the fact that Corning knew of plaintiff's trademark registration at the time it adopted the name for the Corning Ware style. Mere knowledge of the mark, however, is not decisive. *See GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990). The evidence indicated that Corning, although it knew of Packer's earlier registration for the name "Casual Elegance," decided to go forward with the same name because the name continued the association with "elegance" that Corning had established in the 1980's with two of its previous styles—Clear Elegance and Classic Elegance. In addition, defendant noted that plaintiff's registration was for plastic dinnerware, whereas defendant's product was classified as "non-electric cookware."

### 3. *Relation in Use and Manner of Marketing of the Products*

■ Differences in the nature of the goods is a relevant consideration. *Lenox Inc. v. Ranmaru U.S.A. Corp.*, 17 U.S.P.Q.2d 1696, 1990 WL 263435 (S.D.N.Y.1990). The plaintiff's plastic products do not have the thermal and other unique attributes of the Pyroceram glass-ceramic Corning Ware products. The plaintiff's products are not purchased for cooking and cannot be used in conventional ovens or on stove tops. Plaintiff's statements at the hearing that it intends in the future to offer products for use in microwave, and possibly ceramic products, is not persuasive evidence of product similarity, particularly given that consumers are not aware of this intention. *See Universal Money Centers, Inc. v. AT & T Co.*, 797 F.Supp. 891, 895 (D.Kan.1992), *aff'd,* 22 F.3d 1527 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994) ("the intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion") (quoting *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 582 (2d Cir.1991); *Kingsford Products Co. v. Kingsfords, Inc.*, 715 F.Supp. 1013, 1019 (D.Kan.1989), *aff'd,* 931 F.2d 63 (10th Cir.1991) ("plaintiff is not entitled to trademark protection merely because it hopes to some day market a barbecue sauce prominently bearing the Kingsford name").

■ The means by which the two products are marketed is also relevant to the determination of likelihood of confusion. *Beer Nuts I,* 711 F.2d at 941. The court finds that although evidence was presented that both parties sell their Casual Elegance product lines at Wal–Mart, to date, this is the only channel of trade that overlaps. Corning's Casual Elegance products are sold principally in department stores, specialty shops, and catalogue showrooms such as Best Products and Service Merchandise. Packer-Ware's Casual Elegance is sold primarily at Wal–Mart and Family Dollar stores. Moreover, Kinlin testified that the industry separates cookware from dinnerware in point of sales analysis, merchandising, market research, and trade and consumer communications. Another aspect of marketing, the labeling and product packaging, is very dissimilar, as discussed *supra.* The court thus concludes that the foregoing marketing differences help preclude customer confusion.

#### 4. Degree of Care Exercised by Consumers

■ Another factor to be considered is "the degree of care likely to be exercised by purchasers." *Beer Nuts II*, 805 F.2d at 925. "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." *Beer Nuts I*, 711 F.2d at 941 (quoting *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979)) (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 81.2, at 577 (3d ed.1969)). Inexpensive items which are purchased on impulse or with little care are more likely to be confused than expensive items which are chosen carefully. *Beer Nuts I*, 711 F.2d at 941.

According to the evidence produced at the hearing, PackerWare tumblers are priced from $0.78 to $1.32 per set; pitchers are listed at $1.69, bowls are priced at $1.16 and $1.62 per set, and plates are priced at $2.02 for a set of four. A set of three tumblers retails for approximately $1. In contrast, the price of Corning Ware Casual Elegance is approximately $12.99 to $27.99 per piece, with sets priced from $24.99 to $89.99, although some stores discount these prices.[1] The court finds that the Corning Ware products are relatively more expensive than the PackerWare products. Accordingly, we conclude that, in general, consumers would likely exercise a higher degree of care when purchasing Corning Ware products than they would when purchasing PackerWare products.

#### 5. Actual Confusion

■ The best evidence of likelihood of confusion in the marketplace is actual confusion. *Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*, 724 F.Supp. 808, 816 (D.Kan.1989). On the other hand, the absence of evidence of actual confusion does not necessarily mandate a finding that there exists no likelihood of confusion. *Beer Nuts*

*II*, 805 F.2d at 928. Where the products sold by the parties have been available contemporaneously for only a short time, evidence of actual confusion is particularly apt to be unavailable and its absence under such circumstances is understandable and especially unimportant. *Centaur Communications v. A/S/M*, 830 F.2d 1217, 1227 (2nd Cir.1987).

Plaintiff has submitted no direct evidence of actual customer confusion, except for Schwartzburg's hearsay testimony that some personal friends of his were confused and asked him about the two products. The court concludes that while this evidence of actual confusion is at best meager, the lack of substantial evidence of actual confusion is of little significance in the instant case. Because the parties have only sold their products contemporaneously for a few months, evidence of the actual confusion factor has little probative value in assessing likelihood of confusion in the marketplace. Even so, what little actual confusion plaintiff has demonstrated does not materially assist its case.

#### 6. Strength of the Mark

The court determines that it need not make a specific finding as to the strength of Packer's trademark. Even if we were to find that the plaintiff's mark was a strong one, the other factors discussed above, when considered together, compel the conclusion that the average consumer would not be confused or deceived by Corning's use of the term Casual Elegance. *See Beer Nuts II*, 805 F.2d at 925 (all of the factors are interrelated and no one factor is dispositive).

After reviewing each of the factors set forth above, the court finds that on the present record, the plaintiff has failed to sustain its burden of showing that there is a likelihood of confusion in the marketplace concerning the source, origin or sponsorship of the parties' goods. Accordingly, the court concludes that plaintiff has failed to demonstrate a substantial likelihood that it will ultimately prevail on the merits of its infringement or false designation of origin claims.

---

1. Plaintiff emphasizes that Corning will begin marketing an individual serving dish for about $5, and is currently selling a plastic dish cover for $2.59. The court finds that these prices are not representative of the majority of products in the Corning Ware Casual Elegance product line.

### B. *Likelihood of Success on the Merits— Unfair Competition*

Plaintiff's complaint also includes a state law claim of unfair competition. The law of unfair competition imposes liability against one who markets goods bearing an unprivileged imitation of the physical appearance of another's goods. *Polo Fashions, Inc. v. Diebolt, Inc.*, 634 F.Supp. 786, 790 (D.Kan. 1986). An imitation is unprivileged if the "imitation is likely to cause prospective purchasers to regard [A's] goods as those of [B], and ... the imitated feature is nonfunctional." *Restatement of Torts* § 741 (1938). Thus, the essential element of an unfair competition claim is the same as that for an infringement or false designation of origin claim. *Polo Fashions*, 634 F.Supp. at 790.

In light of the court's previous conclusions with regard to plaintiff's infringement and false designation claims, the court finds that plaintiff has failed to demonstrate a substantial likelihood of prevailing on its unfair competition claim.

### C. *Irreparable Injury*

The likelihood of success is only one factor to be considered on a motion for preliminary injunction; irreparable injury is equally important. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984). Because a trademark represents intangible assets, such as reputation and goodwill, irreparable injury will be presumed upon a showing of trademark infringement. *Amoco Oil v. Rainbow Snow*, 809 F.2d 656, 663–64 (10th Cir.1987). Because plaintiff has failed to demonstrate a likelihood of consumer confusion, the court finds that irreparable injury to the plaintiff cannot be presumed.

Absent this presumption, the court finds that plaintiff has presented little or no evidence of specific irreparable injury. Indeed, all of the evidence that plaintiff presented to establish irreparable harm concerned the harmful effects PackerWare would experience resulting from consumer confusion. For that matter, Corning presented evidence that it was capable of responding in money damages in the event plaintiff ultimately prevailed at trial.

Moreover, when a movant shows no specific harm other than the harm that is presumed to result from a likelihood of confusion, the movant's delay in bringing suit is an important factor in determining irreparable harm. *GTE Corp. v. Williams*, 731 F.2d at 679. *See also Kingsford Products Co. v. Kingsfords, Inc.*, 674 F.Supp. 1428, 1431 (D.Kan.1987) (delay in seeking injunctive relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests there is, in fact, no irreparable injury."); J. Gibson, *Trademark Protection and Practice* § 8.07[1] (1984) ("Undue delay in seeking [a preliminary injunction] once plaintiff has, or should have, knowledge of the infringement will probably result in its denial.")

Here, although plaintiff first became aware of Corning's use of the term "Casual Elegance" at the January 1995 Housewares show, plaintiff waited until March 31, 1995, to file a complaint, and until April 18 to move for preliminary relief. While the time is relatively short, under the circumstances, with Corning initiating an intensive product launch, a delay of even a few months weighs against a claim that urgent relief is warranted. *See, e.g., Stokely–Van Camp, Inc. v. Coca–Cola Co.*, 2 U.S.P.Q.2d 1225, 1227, 1987 WL 6300 (N.D.Ill.1987) ("[I]n May Stokely knew that Coke was about to introduce a product by the same name.... Stokely chose to wait three months before filing suit while Coke was spending substantial amounts to market its product.... [T]he fact that Stokely waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction."); *Mego Corp. v. Mattel, Inc.*, 203 U.S.P.Q. 377, 382, 1978 WL 21347 (S.D.N.Y.1978) (plaintiff's failure to move for a preliminary injunction in a timely fashion is a basis for the denial of preliminary relief, "especially where the delay on the part of plaintiff has caused the balance of hardships to tip decidedly in defendant's favor"). The court finds that plaintiff's delay in seeking injunctive relief cuts against a finding of irreparable harm. Accordingly, we conclude plaintiff has failed to establish that irreparable injury will result if a preliminary injunction is denied.

## D. Balancing of Hardships

In considering a motion for preliminary injunction, the court must examine whether the injury to the plaintiff outweighs the harm which granting the injunctive relief would inflict on the defendant. *Paramount Pictures*, 724 F.Supp. at 813. Plaintiff has not presented the court with any evidence of estimated actual damages. For example, PackerWare was unable to show that there have been or will be any lost sales. Indeed, the court finds that any damage to Packer-Ware that plaintiff contends would result from Corning's use of "Casual Elegance" is undercut by plaintiff's testimony that sales of PackerWare's "Casual Elegance" plastic products have not been large, have actually declined from 1992 to 1993, and have not yet recovered to the 1992 level. There is no evidence that the availability of Corning Ware Casual Elegance Pyroceram ovenware will affect in any way future marketing of $1 plastic tumblers and plastic products. Moreover, the court finds plaintiff's claim that it intends in the future to expand its business beyond plastics to be too speculative to accord such assertion much weight.

On the other hand, the evidence established that a preliminary injunction would impose substantial hardship on Corning. If Corning were enjoined from using the name "Casual Elegance," the costs associated with development and promotion of the name would be "sunk costs" for the company. Clark Kinlin, Vice–President, Marketing, of Corning Consumer Products Company, testified that in the short term, Corning stood to lose four million dollars in advertising invest-ment, five million dollars in product mark-downs once the product line was discontinued, and one half million to one million dollars to destroy existing packaging material and design new packaging and commercials.[2] Over the long term, Kinlin testified that an injunction would adversely affect Corning's relationship with the trade and its ability to introduce new products in the future, resulting in significant damage to Corning's reputation and severe financial loss.

The court concludes that this is a case "where an injunction will unfairly disadvantage a second user who has expended considerable sums to promote his [mark] before the first user raised the issue of infringement." *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1279 (S.D.N.Y.1986). Accordingly, the court finds that plaintiff's speculative injuries are outweighed by the expenses defendant would incur if a preliminary injunction were to issue.[3]

## E. Public Interest

It is well established that one of the primary purposes in enacting the Lanham Act was to ensure that consumers are not deceived as to the source of goods purchased. *See, e.g., Ameritech, Inc. v. American Info. Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987). In view of the court's previous conclusion that the likelihood of significant consumer confusion is minimal, the court does not believe that the public interest demands preliminary injunctive relief. Rather, the court finds that the public interest is best served, at this stage of the proceedings, by

2. Plaintiff, in its post-trial brief, attempts to impugn the credibility of Kinlin by focusing on what it terms an inconsistency in Kinlin's testimony. Specifically, plaintiff contends that Kinlin inconsistently referred to four million dollars worth of merchandise in the field, but also indicated Corning would lose approximately five million dollars through marked down merchandise. Plaintiff argues that "four million dollars worth of products cannot be marked down by five million dollars," and that this is evidence that Kinlin is not sufficiently familiar with the figures regarding Corning's potential losses. The court has carefully examined the transcript of the hearing, and notes that Kinlin testified that Corning had between four and six million dollars worth of inventory in the retail channel, and that if an injunction issued, the goods would have to be marked down 80% to 100%. Thus, an estimate of five million dollars for marked down merchandise is entirely plausible given the parameters to which Kinlin testified. The court also observes that it found Kinlin to be a highly credible witness, and qualified to testify to the marketing and product concerns of Corning.

3. In addition, the court notes that plaintiff at the hearing was unprepared to commit itself to posting a multi-million dollar bond. In plaintiff's proposed findings of fact and conclusions of law, plaintiff submits it is prepared to post a bond in the amount of $100,000. The court finds such a bond amount insufficient in light of the evidence presented regarding defendant's injuries were an injunction to issue.

allowing Corning to continue to market and advertise its "Casual Elegance" product line.

In conclusion, the court finds that plaintiff has failed to establish its entitlement to a preliminary injunction.

IT IS THEREFORE ORDERED that plaintiff PackerWare's motion for preliminary injunction (Doc. # 5) is denied.