**PRIMEDIA INTERTEC CORPORATION,**
**Plaintiff,**

v.

**TECHNOLOGY MARKETING**
**CORPORATION,**
**Defendant.**

**No. CIV. A. 98–2384–KHV.**

United States District Court,
D. Kansas.

Nov. 6, 1998.

William D. Beil, Rouse, Hendricks, German, May & Shank, Kansas City, MO, Baila H. Celedonia, Cowan, Liebowitz, Latman, P.C., New York, NY, Kirk T. May, Rouse, Hendricks, German, May & Shank, Kansas City, MO, Ronald W. Meister, Cowan, Liebowitz, Latman, P.C., New York, NY, for plaintiff.

Amy E. Bauman, Norman Siegel, Curtis E. Woods, Sonnenschein, Nath & Rosenthal, Kansas City, MO, David S. Klinestiver, A. James Richardson, Shannon Stewart, Locke, Reynolds, Boyd & Weisell, Indianapolis, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on plaintiff's *Motion For Preliminary Injunction* (Doc. # 3) filed August 26, 1998. Plaintiff seeks to enjoin defendant from using "the trademark Internet Telephony or any other mark or title that incorporates the term Telephony." For reasons set forth below, the Court finds that plaintiff's motion must be denied.

### Facts

Plaintiff produces some 85 trade and business-to-business magazines for various industries. Plaintiff and its predecessors have published *Telephony*, a print magazine for professionals in the public network telecommunications industry, since 1901. As measured by both advertising pages and advertising revenue, *Telephony* is plaintiff's most successful magazine, and it is the oldest telecommunications magazine to continuously use the same name. Individuals in the telephone, cellular, wireless and cable fields comprise the predominant market for *Telephony*, which plaintiff provides free of charge to some 65,000 subscribers. Plaintiff owns United States Registration Number 1,921,912 for the mark **Telephony**.[1]

Plaintiff also publishes *Global Telephony*, a magazine for readers outside of North America. *Global Telephony* has substantially the same editorial mission as *Telephony*, but it is tailored for foreign readers. Plaintiff owns United States Registration Number 1,940,519 for the mark **Global Telephony.**

Plaintiff previously published a magazine called *Telephony Outside Plant.* Plaintiff owns United States Registration Number 1,939,273 for the mark **Telephony Outside Plant.** Plaintiff does not intend to re-publish *Telephony Outside Plant* at this time. Also, plaintiff formerly published *Telephony's Buyer's Guide,* a stand-alone catalogue of data and services. Plaintiff now publishes this guide as a featured insert in *Telephony*. Plaintiff publishes a number of supplements to *Telephony*, all bearing the **Telephony** mark.

Since July of 1996, plaintiff has produced an Internet version of *Telephony*. This product, which is known in the trade as a "webzine," is titled "Internet Telephony." Plaintiff's universal resource locator ("URL") for its webzine is ww w.internettelephony.com. The web site describes itself as "[y]our online source for timely, comprehensive technology information about today's telecommunications market." Plaintiff's webzine content is virtually identical to that of *Telephony*, but the webzine also contains material which is not available in *Telephony*. The webzine title page shows the word "internet" in lowercase italics before the word "Telephony" in thin capital block lettering with the "o" appearing inside a square, all against a dark background.

Plaintiff has advertised its webzine in *Telephony*, committing ad space that theoretically could have been sold for about $400,000. Plaintiff uses prominent information boxes and advertisements on the contents page and banner advertisements. In addition, *Telephony* prominently displays the webzine

---

1. At the risk of further confusing an already confusing record, the Court will use italics to refer to print magazines such as *Telephony* and will use bold print to refer to trademarks such as **Telephony**. In referring to Internet web sites, the Court will use the web site name in quotations, *i.e.* "Internet Telephony."

URL on its cover. As it developed its webzine, plaintiff used *Telephony* to keep readers informed of progress. Plaintiff also promotes its webzine at exhibitions and through direct mail, media kits and traditional marketing methods.

Readership of plaintiff's webzine has grown considerably since its inception in June of 1996. By July of 1998, the webzine received 19,500 daily "hits" (brief contacts with the site), up from 1,100 hits per day in June of 1996. In August 1998, the webzine received 1,500 daily "sessions" (longer visits to the site), while it received only 75 sessions each day in June of 1996. "Internet Telephony" sells advertising space and serves as an independent profit center for plaintiff. Plaintiff anticipates webzine advertising revenue of $100,000 for 1998, increasing to $400,000 in 1999.

In January 1998, plaintiff applied to register the **Internet Telephony** mark. This application is currently pending. Plaintiff's application describes the webzine as "providing information in the field of the public network telecommunications industry rendered via computer by means of a global computer network."

Defendant has historically published trade magazines for newly developing industries, and it now publishes several business magazines for professionals in the telemarketing, computer telephony and telecommunications fields. In 1982, defendant began publishing *Telemarketing,* the first magazine devoted to the emerging field of telemarketing. In the early 1990's, defendant began publishing *CTI,* a magazine concerning the emerging field of computer telephony. Computer telephony is a term which refers to "the adding of intelligence, computer intelligence, and the power of computer network to telecommunications or telephony."

In March of 1996, defendant recognized that Internet telephony ("IT"), a term which describes the Internet transmission of telephony, fax and video communications, is a growing field within the computer telephony industry. IT allows individuals to speak to one another through computers for the cost of a local phone call, thus avoiding long distance charges. Defendant determined that *CTI* could not feature all relevant information that it wanted to publish for the IT market, and that no other magazines were exclusively addressing IT. Defendant therefore decided to publish an IT magazine, which it aptly named *Internet Telephony.* When it made this decision, defendant was unaware that plaintiff had a webzine called "Internet Telephony." [2] Around October 23, 1997, defendant learned that plaintiff had a webzine called "Internet Telephony." Defendant decided not to change the name of its magazine, however, and proceeded to publish the first issue of *Internet Telephony* in February of 1998.

On December 19, 1997, defendant rented portions of the *Telephony* mailing list, to target individuals that would be interested in subscribing to *Internet Telephony.* In doing so, defendant identified itself not as *Internet Telephony* but as *CTI.* Plaintiff rented defendant the list, not knowing that defendant intended to publish *Internet Telephony* in February 1998.

The cover of *Internet Telephony,* as published in hard copy, contains the word "Internet" in red in large block lettering directly above the word "Telephony" in black, thin lettering, all against a bright yellow background. In the upper left-hand corner, it also contains defendant's logo. *Internet Telephony* also has a web site. Its URL (internettelephonymag.com) is published on the cover and on every page of *Internet Telephony.* That URL takes individuals directly to defendant's company home page, which offers information regarding all of defendant's magazines and products, not just *Internet Telephony.* Before adopting int ernettelephonymag.com as a URL, defendant searched other available URLs, including internet-telephony.com.

Defendant provided a media kit to market its new magazine. The kit identified telecommunications professionals, local exchange carriers, wireless companies, personal communications systems companies, Internet

---

**2.** The record does not disclose whether defendant chose the name *Internet Telephony* before or after plaintiff introduced its webzine "Internet Telephony" in June of 1996.

service providers, and cable companies as the target audience for *Internet Telephony*. Many of defendant's subscribers in Kansas fall within these categories.

On September 8, 1998, defendant received a registration on the Supplemental Register for **Internet Telephony** as a trademark for "magazines in the field of telecommunications applications and technologies associated with global computer information network."

Plaintiff has received two e-mails from confused individuals who believe that plaintiff published *Internet Telephony*. Defendant has not received any comments or inquiries which suggest confusion between plaintiff's products and those of defendant.

### Preliminary Injunction Standard

■ The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." *Tri–State Generation and Transmission Ass'n. Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986). A preliminary injunction is a drastic and extraordinary remedy, and courts do not grant it as a matter of right. *Paul's Beauty College v. United States*, 885 F.Supp. 1468, 1471 (D.Kan.1995); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948, at 128–29 & nn. 3, 6–7 (1995). We must deny injunctive relief if the moving party fails to establish any requisite element, *Packerware Corp. v. Corning Consumer Products Co.*, 895 F.Supp. 1438, 1446 (D.Kan. 1995), and the moving party must establish that it is entitled to injunctive relief by clear and unequivocal proof. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975); *Paul's*, 885 F.Supp. at 1471.

■ In order to obtain a preliminary injunction, plaintiff must establish that (1) it will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause defendant; (3) the injunction, if issued, will not be adverse to the public interest; and (4) there is a substantial likelihood that plaintiff will eventually prevail on the merits. *Tri–State*, 805 F.2d at 355 (citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980)); *Heatron, Inc. v. Shackel-*

*ford*, 898 F.Supp. 1491, 1498 (D.Kan.1995). Courts disfavor three types of preliminary injunctions: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991); *Paul's*, 885 F.Supp. at 1471. When a movant seeks a preliminary injunction that falls within one of these categories, courts require the movant to satisfy the even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may issue. *Visa*, 936 F.2d at 1098–99; *Paul's*, 885 F.Supp. at 1472.

### Analysis

■ As an initial matter, the Court observes that the preliminary injunction which is requested in this case is among those types of injunctions which are disfavored under *Visa. See* 936 F.2d at 1098–99. First, the injunction that plaintiff seeks would disturb the status quo. "The status quo is not defined by the parties['] existing legal rights; it is defined by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *Id.* at 1100. Defendant currently publishes the challenged magazine, and has done so since February of 1998—well before plaintiff filed suit on August 24, 1998. To prohibit defendant from publishing its magazine would disturb the status quo, and the Court therefore must apply the heavy and compelling standard, even if the status quo may currently violate plaintiff's rights.

Furthermore, the requested injunction would grant plaintiff substantially all of the relief which it seeks. Plaintiff seeks to enjoin defendant from using the words "internet telephony" and other words in connection with the word "telephony." Such an injunction would force defendant to either stop publishing its magazine or change its name.

Plaintiff will achieve both of these results if it wins at trial. Even though plaintiff also seeks monetary damages under the Lanham Act, defendant's name change constitutes a substantial part of plaintiff's relief and requires plaintiff to meet the heavy and compelling standard. *GTE Corp. v. Williams,* 731 F.2d 676, 679 (10th Cir.1984); *see also Sprint Corp. v. DeAngelo,* 12 F.Supp.2d 1188, 1192 (D.Kan.1998). It is apparent that plaintiff's main objective is keep defendant from using its current name. The preliminary injunction would have such an effect, and plaintiff is therefore required to show that the four factor test weighs heavily and compellingly in its favor.

## A. Substantial Likelihood Of Success

■ Plaintiff brings suit for trademark infringement and unfair competition in violation of the Lanham act and Kansas common law. Section 43(a) of the Lanham Act creates a federal cause of action for infringement of unregistered marks. *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 528. (10th Cir.1987); *Stanfield v. Osborne Industries, Inc.,* 52 F.3d 867, 873 (10th Cir.1995). The common law of unfair competition allows a similar cause of action to prevent confusion between plaintiff's and defendant's products. *American Fence Co. of the Midwest, Inc. v. Gestes,* 190 Kan. 393, 397, 375 P.2d 775, 779 (1962); *Western Chemical Pumps, Inc. v. Superior Mfg., Inc.* 989 F.Supp. 1112, 1130 (D.Kan.1997). To prevail on its claims, plaintiff must prove (1) that it owns a valid, protectable trademark and (2) that defendant's product is so similar to plaintiff's that it is likely to cause consumer confusion. *DeVore & Sons, Inc. v. Thomas Nelson, Inc.,* 12 F.Supp.2d 1157, 1159 (D.Kan.1998); *American Fence Co.,* 190 Kan. at 398–99, 375 P.2d at 780; *Polo Fashions, Inc. v. Diebolt, Inc.,* 634 F.Supp. 786, 790 (D.Kan.1986) (confusion is essential element of both unfair competition and infringement claims).

As noted, plaintiff has registered trademarks for **Telephony, Global Telephony** and **Telephony Outside Plant.** Based on its registration of **Telephony,** plaintiff seeks a preliminary injunction which prevents defendant from "using ... any ... mark or title that incorporates the term Telephony." Also, even though defendant has a registration on the Supplemental Register for **Internet Telephony,** plaintiff seeks to enjoin it from "using the trademark Internet Telephony." Plaintiff appears to argue that it has valid marks in both **Telephony** and **Internet Telephony,** and that defendant has infringed both marks.[3] The Court must therefore determine whether plaintiff can show a substantial likelihood that either mark is a valid, protectable trademark under the Lanham Act and the common law of unfair competition.

### 1. Internet Telephony

### a. Validity of Mark

There are four different categories that describe marks: (1) arbitrary and fanciful, (2) suggestive, (3) descriptive, and (4) generic. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 939 & n. 5 (10th Cir.1983) (*Beer Nuts I* ); *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see also American Fence Co.,* 190 Kan. at 398–99, 375 P.2d at 780. Generic refers to " 'a particular genus or class of which an individual article or service is but a member.' " *Beer Nuts I,* 711 F.2d at 939 n. 5 (quoting *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir.1980)). Generic marks do not receive trademark protection. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. At the opposite end of the spectrum, arbitrary or fanciful trademarks " 'bear no relationship to the product or service with which they are associated.' " *Beer Nuts I,* 711 F.2d at 939 n. 5 (quoting *Soweco,* 617 F.2d at 1184). Suggestive marks require " 'imagination, thought and perception to reach a conclusion as to the nature of goods.' " *Beer Nuts I,* 711 F.2d at 939 n. 5 (quoting *Abercrombie & Fitch Co. v. Hunting World,* 537 F.2d 4, 11 (2d Cir.1976)). Both of these categories of marks are so inherently distinctive that they are entitled

---

**3.** Plaintiff does not clearly argue that defendant has infringed both marks. At times, plaintiff appears to view the marks as one. The two marks are different, however, and must be evaluated separately.

to protection. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753; *see also American Fence Co.,* 190 Kan. at 398, 375 P.2d at 780. A descriptive trademark " 'conveys an immediate idea of the ingredients, qualities or characteristics of the goods.' " *Beer Nuts I,* 711 F.2d at 939 n. 5 (quoting *Abercrombie & Fitch Co.,* 537 F.2d at 11). Descriptive marks are only protected when they have acquired a distinctiveness or secondary meaning that identifies the descriptive mark with a particular product. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753; *American Fence Co.,* 190 Kan. at 398–99, 375 P.2d at 780.

Plaintiff must first establish that Internet Telephony is a protectable mark. Defendant cites various cases that have found periodical titles to be generic.[4] *See, e.g., Technical Publ'g Co. v. Lebhar–Friedman, Inc.,* 729 F.2d 1136 (7th Cir.1984); *CES Publ'g Corp. v. St. Regis Publications,* 531 F.2d 11 (2d Cir.1975); *see also* J. Thomas McCarthy, *McCarthy On Trademarks* at § 10.9. While most courts have found magazine titles to be descriptive, the vast majority of these titles describe only the topic covered and not the class of publication (i.e."magazine"). *National Information Corp. v. Kiplinger Washington Editors, Inc.,* 771 F.Supp. 460 (D.D.C. 1991) (PERSONAL FINANCE is descriptive); *McGraw–Hill Publ'g Co. v. American Aviation Associates,* 117 F.2d 293 (D.C.Cir. 1940) (AVIATION is descriptive); *American Ass'n for Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244 (D.D.C.1980) (SCIENCE is descriptive ); *Travel Magazine, Inc. v. Travel Digest, Inc.,* 191 F.Supp. 830 (S.D.N.Y.1961) (TRAVEL is descriptive); *see also,* McCarthy at § 10.8, 10.9. Defendant's cases have found periodical titles to be generic when they not only include a specific topic, but also a class of publication or mode of delivery. *See Reese Publ'g Co. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 10–11 (2d Cir.1980) (VIDEO BUYERS GUIDE generically refers to class of video buyer's guides); *CES Publ'g,* 531 F.2d at 14–

15 (CONSUMER ELECTRONICS MONTHLY is generic name of class of magazines describing electronic equipment for consumers).

■ Plaintiff argues that the generic name for its product would be webzine, web magazine, or publication, rather than "telephony" or "Internet telephony," and that its mark is therefore descriptive rather than generic. *See In re Waverly, Inc.,* 1993 WL 311934, 27 U.S.P.Q.2d 1620, 1623 (Trademark Tr.& App. Bd.1993) (generic name for class of medical publications is "medical journals," not "medicine"). Even if the Court were to agree that plaintiff has a substantial likelihood of prevailing on this issue, plaintiff must show that its mark has acquired secondary meaning which connects **Internet Telephony** with a single source. *Beer Nuts I,* 711 F.2d at 940. Plaintiff initially argues that **Internet Telephony** has secondary meaning because the secondary meaning which attached to **Telephony** mark has "transferred naturally" to Internet Telephony. Aside from case law which allows secondary meaning to continue when the holder of a mark changes the ma ·k for business decisions or applies the same mark to a new product, plaintiff cites no case law to support its theory of transference,. *See, i.e., In re Flex–O–Glass, Inc.,* 1977 WL 22504, 194 U.S.P.Q. 203 (Trademark Tr.& App.Bd.1977); *In re Owens–Illinois Glass Co.,* 1964 WL 8015, 143 U.S.P.Q. 431 (Trademark Tr.& App.Bd.1964). Plaintiff's cases would have relevance if plaintiff had chosen to call its webzine *Telephony,* thus shifting its trademark to another product. In this case, however, plaintiff chose a new mark— Internet Telephony—to refer to its webzine. These cases do not address the shifting of secondary meaning from one mark to a different mark.

Plaintiff then argues that Internet Telephony is entitled to protection under the "family of marks" doctrine.[5] Under the "family of marks" doctrine, plaintiff must

---

4. Ironically, even though defendant has obtained supplemental registration of its mark **Internet Telephony**, defendant argues that plaintiff's alleged mark is generic and not protectable as a periodical title. On its face, defendant's argument is fraught with peril, because it appears to concede the invalidity of its own trademark.

5. The Court notes that plaintiff makes this argument in its pre-hearing motion, but not in its post-hearing brief.

show that it has a group of marks organized around a common surname and that defendant's product uses the surname in a way that is likely to cause confusion. J. Thomas McCarthy, *McCarthy On Trademarks* § 23.61. Courts have found a family of marks based upon the "Mc" prefix used by McDonald's restaurants and their various products. *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463 (Fed.Cir. 1991). The suffix "R US," used by Toys R Us and Kids R Us, is another example of a proven family of marks. *Geoffrey, Inc. v. Stratton*, 16 U.S.P.Q.2d 1691 (C.D.Cal.1990). While the Tenth Circuit has not addressed the "family of marks" doctrine, the Federal Circuit has provided the following definition of a trademark family:

A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods ... Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family.

*J & J Snack Foods*, 932 F.2d at 1462–63. Plaintiff argues that it has a family based on the "Telephony" surname. Plaintiff must show that the pattern of usage of the word Telephony now causes consumers to believe that any publication using the word Telephony comes from a common origin. *Id.* at 1463; *see Polaroid Corp. v. American Screen Process Equipment Co.*, 1970 WL 9534, 166 U.S.P.Q. 151 (Trademark Tr.& App.Bd.1970). Plaintiff's alleged family includes **Telephony, Global Telephony, Telephony Outside Plant,** and the unregistered mark **Telephony's Buyer's Guide.** Plaintiff no longer publishes *Telephony Outside Plant,* and it now publishes *Telephony's Buyer's Guide* as a feature in *Telephony* instead of as a separate publication. Defendant provides evidence that two other trade magazine use a "telephony" surname: *Computer Telephony Magazine* and *IP Telephony Magazine.* Numerous books and trade periodicals, totally unrelated to plaintiff, have also used a "telephony" surname in their titles. Plaintiff therefore cannot demonstrate a substantial likelihood that it will prove a family of marks using that surname.

Plaintiff is forced to show that Internet Telephony has developed its own secondary meaning, *i.e.* that the term Internet Telephony is "distinctive of the applicant's goods in commerce." *Beer Nuts I,* 711 F.2d at 940 (citations omitted). Plaintiff's webzine must have developed this secondary meaning before defendant began publishing its magazine. *Miller v. Chisholm,* 1991 WL 158040 at *3 (D.Kan.1991); *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1201 (Fed.Cir.1994); *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 125–26 (4th Cir.1990). The Court must evaluate various factors in determining whether secondary meaning exists. Some of the relevant factors include (1) consumer testimony or surveys, (2) advertising and promotion, (3) unsolicited media coverage of the product, (4) length and manner of use, and (5) volume of sales. *Western Chemical Pumps v. Superior Mfg., Inc.,* 989 F.Supp. 1112, 1120 (D.Kan.1997) (trade dress); *Dun & Bradstreet Corp. Found. v. National Seminars, Inc.,* 1990 WL 182338 (D.Kan.1990). No single factor is dispositive and plaintiff need not produce evidence of each factor. *Id.*

Plaintiff has actively promoted its webzine by placing approximately $400,000 worth of advertising in *Telephony.* Plaintiff advertises the URL for its webzine on the cover of every edition of *Telephony* and also advertises the webzine on the contents page and with information boxes in *Telephony.* While it developed the webzine, plaintiff used *Telephony* to inform potential readers of its progress. Plaintiff also promotes its webzine at trade shows and exhibitions and through direct mail and media kits.

Plaintiff's webzine has received unsolicited media coverage through one favorable review. Plaintiff has also produced one example of "reader comments," but it is actually

an e-mail from a corporation that awards outstanding websites. This is more accurately viewed as a second example of favorable media coverage and not as a consumer comment.

Plaintiff began its webzine in June of 1996, while defendant began its magazine 19 months later, in February of 1998. Plaintiff's evidence shows that its readership has grown significantly from 1996 through July and August of 1998. This evidence fails to show, however, the amount of circulation that plaintiff received prior to February of 1998. The Court is unable to determine whether the webzine had received enough readers to create secondary meaning by February of 1998, when defendant first published its magazine.

Plaintiff lacks evidence that the webzine has acquired any secondary meaning among advertisers, the webzine's only source of revenue. Plaintiff anticipates advertising revenue over $100,000 in 1998 and $400,000 in 1999. Again, plaintiff's evidence fails to show the webzine's advertising revenue prior to February of 1998. No record evidence suggests that plaintiff's webzine has acquired secondary meaning among advertisers.

Plaintiff's evidence of secondary meaning in the Internet Telephony mark does not show a substantial likelihood that consumers associate the term Internet Telephony with plaintiff. Plaintiff has presented solid evidence of its efforts to promote the webzine and create secondary meaning, but any evidence of public recognition is weak. Plaintiff lacks evidence of the webzine's advertising revenue prior to defendant's magazine. Plaintiff also lacks solid evidence regarding the readership of its webzine when defendant began publishing its magazine. Plaintiff is only able to provide two examples of media coverage and no testimony from consumers. While plaintiff may ultimately prevail at trial, plaintiff is unable to show a substantial likelihood of success in proving that Internet Telephony had acquired secondary meaning during the relevant time periods.

**b. Likelihood of Confusion**

Even assuming that plaintiff's Internet Telephony mark had acquired secondary meaning during the relevant time period, plaintiff has not shown a substantial likelihood of success as to likelihood of confusion. In determining whether marks are likely to cause confusion, the Tenth Circuit has set forth the following list of factors that the Court must use: (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (d) the degree of care likely to be exercised by purchasers; (e) evidence of actual confusion; and (f) the strength or weakness of the marks. *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 652 (10th Cir.1996).

**1. Similarity Between the Marks**

■ The Court must look at three factors to determine the degree of similarity that exists: sight, sound, and meaning. *First Sav. Bank*, 101 F.3d at 653. As plaintiff notes, similarity is not determined merely by a side-by-side comparison. *Beer Nuts I*, 711 F.2d at 941. The Court must determine whether defendant's magazine is so different that it will not confuse consumers when they encounter it alone and are therefore unable to compare plaintiff's and defendant's products side by side. *Id.* Plaintiff's webzine ("Internet Telephony") and defendant's magazine (*Internet Telephony*) have the same name, so they sound the same. The two products are completely distinguishable, however, by sight. To begin with, plaintiff's product is a webzine, requiring public access through a computer. Plaintiff only provides editorial content online. Consumers who want to read "Internet Telephony" must use a computer to read the webzine. Defendant provides its editorial content only in print. Consumers must actually pick up a copy of defendant's magazine in order to read it. While defendant does maintain a web site called internettelephonymag.com, the site takes readers to defendant's company home page which, based on the evidence of record, apparently does not contain editorial content from defendant's *Internet Telephony*. Defendant's web site is not a webzine at all; it

contains information about all of defendant's magazines and products.

The home page of the webzine is also significantly different in appearance than the cover of defendant's magazine. Plaintiff's webzine logo shows the word "internet" in lowercase italics preceding the word "Telephony" in thin capital block lettering with the "o" appearing inside a square, all against a dark background. Defendant's magazine cover contains the word "Internet" in red in large block lettering directly above the word "Telephony" in black, thin lettering, all against a bright yellow background. It also contains defendant's company logo in the upper left-hand corner of the cover. The products are visually different.

The products also have different meanings. Plaintiff argues that readers cannot distinguish what plaintiff means when it uses the term "Internet Telephony" and what defendant means by *Internet Telephony,* because the term is the same. There is a substantial difference in meaning, however, that consumers will readily recognize. Plaintiff uses "Internet Telephony" to describe the Internet version of a print magazine, *Telephony.* Defendant uses *Internet Telephony* to describe a print magazine about the IT field. Consumers who are looking for the Internet version of *Telephony* will not look for it at a newsstand; they will look for it on the Internet. There, they will not encounter or be confused by defendant's print magazine, *Internet Telephony.* While the names are identical, the differences between the products weigh against a showing of confusion.

**2. Defendant's Intent in Adopting its Mark**

█ " 'Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion ....' " *Beer Nuts I,* 711 F.2d at 941 (quoting *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980)). "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1485 (10th Cir.1987). The Court must resolve against defendant any doubts regarding its intent in

adopting its mark. *Beer Nuts I,* 711 F.2d at 941. Defendant's deliberate adoption of a similar mark may create an inference that defendant intended to pass its magazine off as plaintiff's. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 927 (10th Cir.1986) (*Beer Nuts II* ). By the same token, mere knowledge of plaintiff's product and an intent to compete with that product is not equivalent to an intent to mislead. *Universal Motor Oils Co. v. Amoco Oil Co.,* 1990 WL 86178 (D.Kan.1990) (citing *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir.1987)).

While defendant had knowledge of plaintiff's mark, the evidence does not support an inference that defendant intended to infringe plaintiff's mark. Defendant was not aware of plaintiff's mark when it first chose the name for its magazine. Defendant did not deliberately choose a similar mark; defendant had already chosen the magazine's name when it discovered plaintiff's webzine. While defendant could have changed the magazine's name, the evidence does not suggest that defendant deliberately kept its mark to derive benefit from plaintiff's goodwill. Defendant's publisher testified that defendant did not intend to compete with plaintiff and that its magazine covered different subject matter. This evidence does not support an inference that defendant intended to mislead consumers, and the Court can find no reason to doubt this evidence.

Plaintiff argues that defendant's actions in acquiring plaintiff's mailing list also show defendant's intent to derive benefit from plaintiff's goodwill. Defendant's actions in acquiring plaintiff's mailing list are questionable, from the standpoint that defendant did not identify itself as *Internet Telephony,* but as *CTI,* another magazine. While defendant argues that this was merely an error, plaintiff argues that defendant was attempting to disguise its intent to produce *Internet Telephony.* This evidence does suggest that defendant intended to derive benefit from plaintiff's goodwill without plaintiff's knowledge, but it does not suggest that defendant intended to pass off its magazine as if plaintiff produced it.

Plaintiff also argues that defendant's actions in setting up its web site shows defen-

dant's intent to pass its product off as plaintiff's. Defendant attempted to reserve the site internet-telephony.com, which plaintiff argues is close enough to its web site (internettelephony.com) to show intent to mislead consumers. While the URLs are similar, this not surprising. Just as plaintiff sought a URL that was similar to the name of its webzine, defendant sought an address that was similar to the name of its magazine. Defendant's failed attempt to reserve the internet-telephony.com URL does not show that defendant intended to confuse consumers. In addition, the contents of the web sites do not support an inference of devious intent. Defendant's web site is not a webzine, it is the company home page. It provides information on all of defendant's products and magazines and allows consumers to subscribe to these magazines. Plaintiff's site is a webzine, an online periodical containing articles about telecommunications. If defendant intended to mislead consumers, defendant could make its web site a webzine instead of the company home page, thus causing consumers to believe that they have reached plaintiff's webzine. The fact that defendant's product is different than plaintiff's weakens the inference that defendant intended to pass its magazine off as plaintiff's product. Plaintiff's evidence does not show a substantial likelihood of success regarding defendant's intent.

### 3. Relation in Use and Manner of Marketing

■ Both parties market their products in substantially similar methods—through media kits, promotion at conferences, and other traditional marketing techniques. Both parties market their products to the same audience—telecommunications professionals, local exchange carriers, wireless companies, personal communications systems companies, Internet service providers, and cable companies. Many of defendant's subscribers in Kansas fall within these categories. Defendant purchased part of plaintiff's mailing list for *Telephony* before it published its magazine, a fact which—according to plaintiff—shows that defendant intended to target the same audience. Plaintiff's evidence is sub-

stantial enough to suggest that both parties target the same audience.

Plaintiff also argues that both parties target the same advertisers. Plaintiff's evidence concerns advertisers in *Telephony*, however, rather than advertisers in plaintiff's webzine. The record contains no evidence of any overlap between advertisers in plaintiff's webzine and defendant's magazine.

Plaintiff then argues that the parties use their marks to define similar products. Plaintiff argues that the products contain substantial overlap in subject matter. While there is some overlap, the evidence does not show that it is substantial. Plaintiff's webzine focuses on the entire telecommunications realm, while defendant's magazine focuses on the field of IT, a subset of the telecommunications field. Plaintiff covers all telecommunications topics. Plaintiff will overlap into defendant's subject matter in order to cover the entire telecommunications field, which necessarily includes the IT field. Almost any article by defendant overlaps into plaintiff's subject matter, because plaintiff's subject matter is so broad. The overlap is only substantial, however, if plaintiff covers IT much more extensively than any other telecommunication topics. While the parties dispute the amount of coverage that plaintiff gives IT topics, it is clear that plaintiff has not foregone all other telecommunications news in order to exclusively cover IT issues. Plaintiff's webzine and defendant's magazine contain overlapping, but not identical, subject matter. The overlap is not so substantial as to make the subject matter similar.

Consumers will also use the products differently. Consumers looking for information covering the entire telecommunications field will look for plaintiff's webzine on the Internet. Consumers looking for information specifically about IT will look for defendant's magazine and will either subscribe or go to a newsstand. Consumers looking for plaintiff's webzine will not be confused into reading defendant's magazine, because they will not be looking for a print magazine. Even if consumers mistakenly find defendant's web site, they will not mistakenly read defendant's magazine, because defendant does not provide its magazine articles at its web site.

While defendant does allow consumers to subscribe to its magazine at its web site, it is highly unlikely that consumers searching for plaintiff's webzine will mistakenly subscribe to defendant's print magazine because a print magazine is not the product they are looking for—the electronic version of plaintiff's print magazine. Consumers will use the products to meet different needs.

### d. Degree of Care Exercised by Consumers

The record contains no objective evidence regarding the degree of care exercised by readers and advertisers in the telecommunications field. Plaintiff notes that consumers are likely to purchase low cost items with a lower degree of care, *Beer Nuts II,* 805 F.2d at 926, and that in this case, both parties provide their products for free. Both products receive their profits from advertising revenue. The Court must also view advertisers as consumers here. Plaintiff argues that because its advertisers are constantly changing, advertisers do not exercise a high degree of care in selecting telecommunications magazines in which to advertise. The only evidence that advertisers lack a high degree of care in selecting their publications, however, is the opinion of plaintiff's executive. The record contains no credible evidence that paying advertisers do not exercise enough care to distinguish between plaintiff's webzine and defendant's magazine.

### e. Evidence of Actual Confusion

Actual consumer confusion is the best evidence of likelihood of confusion between two products. *Universal Money Centers, Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1534 (10th Cir.1994). Plaintiff provides two e-mails from confused consumers. Both consumers were searching for *defendant's* product and mistakenly believed that defendant had produced plaintiff's webzine. Plaintiff does not provide any evidence that consumers searching for its webzine have mistakenly found defendant's magazine or mistakenly believed that plaintiff produced it. Plaintiff also fails to produce any evidence that advertisers, plaintiff's only source of revenue, have actually confused the two

products. In fact, the evidence weighs against such an inference, because plaintiff anticipates advertising revenue from its webzine to increase 400% from 1998 to 1999. While the Court must give substantial weight to evidence of actual confusion, evidence of actual confusion does not dictate a finding that confusion is likely. *Universal Money,* 22 F.3d at 1535. Plaintiff's two confused consumers do not provide persuasive evidence of actual confusion. These examples are better viewed as isolated instances and de minimis evidence of actual confusion. *Id.* This is especially true when combined with the lack of evidence regarding actual confusion among advertisers.

### f. Strength of Plaintiff's Mark

The strength of plaintiff's mark is a "highly instructive" factor for the Court to consider. *First Sav. Bank,* 101 F.3d at 653. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Universal Money,* 22 F.3d at 1533 (quoting *Exxon Corp. v. Texas Motor Exch.,* 628 F.2d 500, 504 (5th Cir.1980)). "The greater the number of identical or more or less similar marks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific uses of the weak mark." *First Sav. Bank,* 101 F.3d at 653 (citations omitted).

Defendant cites numerous examples of books, companies, consortiums, audio cassettes, conferences, seminars, articles, and university courses that all incorporate the term Internet Telephony. Extensive use of the term within the telecommunications field, especially by other publications, weighs against plaintiff's claim that it has a strong mark. *First Sav. Bank,* 101 F.3d at 653. Even if plaintiff argues that "Telephony" (the dominant term in its Internet Telephony mark) is a strong mark, *see Universal Money,* 22 F.3d at 1533–34, defendant has introduced extensive evidence that the term is used extensively by third parties in the telecommunications field, including two magazines with the term in their titles. The

evidence does not suggest a substantial likelihood of success in proving a strong mark.

■ Combining all of the relevant factors, the Court finds that plaintiff has not shown a substantial likelihood of success on the merits of its claim. The products target the same audience, use similar methods of marketing, and their readers may not be likely to exercise a high degree of care. Also, plaintiff has provided de minimis evidence of actual confusion. These factors, however, are outweighed by the substantial differences between the products. Other than pronunciation, these products are quite different. The products use different media to present editorial content. The products are visually distinct, and the parties attach different meanings to the same name. While their subjects overlap, the products cover different topics. The evidence does not support an inference that defendant intended to derive benefit from plaintiff's goodwill in its webzine. Plaintiff introduced no objective evidence regarding the degree of care exercised by advertisers, or any evidence of actual confusion among advertisers. Plaintiff's Internet Telephony mark is not strong, as shown by the extensive amount of third-party use of the term. Plaintiff fails to show a substantial likelihood that it will succeed in proving that its webzine is likely to be confused with defendant's magazine.

## 2. Telephony

■ Plaintiff's injunction asks the Court not only to enjoin defendant from using the term Internet Telephony, but also from "using . . . any other mark or title that incorporates the term Telephony." To issue such a broad injunction, the Court must find that plaintiff is likely to prove either that *Internet Telephony* is likely to be confused with plaintiff's **Telephony** mark or that defendant is somehow planning to infringe the mark in another way. Plaintiff does not argue either theory. Plaintiff argues that its registered **Telephony** mark is entitled to protection. The Court does not address this issue, however, because plaintiff fails to address the second element that it is required to prove— a likelihood of confusion between **Telephony** and Internet Telephony. The Court is therefore unable to find that plaintiff has a substantial likelihood of success in showing that defendant has infringed its **Telephony** mark.

Even if the Court were to liberally construe plaintiff's motion in order to create such an argument, the Court would find that plaintiff is not substantially likely to succeed on the merits of this claim. First, *Telephony* and *Internet Telephony* are not similar magazines. Their names sound different. The visual appearances of the magazines, especially the lettering and background are different. The parties intend different meanings. Plaintiff uses **Telephony** and *Telephony* to describe a magazine which covers the entire realm of telecommunications. Defendant uses the terms **Internet Telephony** and *Internet Telephony* to describe a magazine which covers the specific area of IT. Defendant's **Internet Telephony** mark is not similar enough to plaintiff's **Telephony** mark for an inference of bad faith, especially when defendant's mark specifically describes the magazine's subject matter—the Internet telephony field.

While the parties market their products in similar ways to a similar audience, the products have a different use, as shown by their subject matter. The magazines' subject matter does overlap, but the magazines do not cover the exact same range of topics. Consumers looking for only IT information will use defendant's magazine. Consumers looking for information about the entire telecommunications industry will use plaintiff's magazine.

Readers may not be likely to exercise a high degree of care because both magazines are free. Plaintiff provides no objective evidence, however, that paying advertisers will not exercise a high enough degree of care when selecting between plaintiff's and defendant's magazines. Plaintiff also provides no evidence of actual confusion between its magazine and defendant's magazine. Plaintiff produced evidence that some of its advertisers also advertise in defendant's magazine, but there is no evidence that confusion has led either readers or advertisers to defendant's magazine. Finally, defendant provides a barrage of evidence showing that third parties who publish materials about the

telecommunications field have freely used the word "telephony." Such use suggests that plaintiff's mark is not strong.

The applicable factors do not suggest any likelihood of confusion. Plaintiff is not substantially likely to show that defendant has infringed its **Telephony** mark. Plaintiff therefore fails to show heavily and compellingly that there is a substantial likelihood that plaintiff will succeed in showing that defendant has infringed either plaintiff's **Telephony** mark or its alleged **Internet Telephony** mark.

## B. Irreparable Harm

■ Plaintiff argues that defendant has infringed plaintiff's trademarks, causing irreparable injury. Trademark infringement "by its very nature" results in irreparable harm to the owner of a mark, unless the trademark is already weak. *Amoco Oil Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 663 (10th Cir.1987). Because a trademark represents intangible assets, such as reputation and goodwill, the Court must presume irreparable injury upon a showing of trademark infringement. *Id.* at 663–664. Plaintiff has failed, however, to show a substantial likelihood that it will succeed on the merits of its trademark infringement claims. The Court therefore cannot make a presumption of irreparable injury in this case.

Plaintiff's evidence of irreparable harm consists of (1) the instances of consumer confusion that it has already encountered and (2) the overlap in advertisers between the parties' products. First, the instances of consumer confusion do not show that plaintiff has been harmed. Both of these examples involve consumers who were attempting to acquire defendant's magazine and arrived at plaintiff's webzine by mistake. This evidence does not show that plaintiff has been harmed. If anything, defendant has been harmed because its readers mistakenly found plaintiff's web site. Plaintiff has introduced no evidence of persons who were attempting to locate plaintiff's webzine and mistakenly found defendant's magazine. Second, plaintiff failed to introduce any evidence that defendant's advertisers overlap at all with the advertisers in plaintiff's webzine or that de-

fendant has harmed the webzine's advertising revenue. The only evidence regarding advertisements in the webzine is that plaintiff projects a 400% increase in advertising revenue from 1998 to 1999. In addition, plaintiff's evidence shows that readership in the webzine has increased dramatically, even since defendant has begun publishing its magazine. Plaintiff does show that advertisers overlap between *Telephony* and defendant's magazine, but plaintiff has shown no evidence that it has lost any advertisers or advertising revenue as a result of this overlap.

Defendant argues that plaintiff's delay in bringing suit discounts plaintiff's claim of irreparable injury. *See Packerware Corp. v. Corning Consumer Products Co.,* 895 F.Supp. 1438, 1452 (D.Kan.1995). Plaintiff did not discover defendant's magazine until defendant published the first issue in February 1998. Plaintiff filed suit on August 24, 1998. Plaintiff's delay of seven months is sufficient delay for the Court to question the necessity of preliminary injunctive relief in this case. *See Packerware Corp.,* 895 F.Supp. at 1452 (three month delay "cuts against a finding of irreparable harm"). Plaintiff has not produced persuasive evidence that it will suffer irreparable harm unless the Court enjoins defendant.

## C. Balance of Hardships

■ Plaintiff argues that defendant will not be harmed by the injunction because it can easily change its name. Plaintiff argues that if defendant is not enjoined, it will continue to erode plaintiff's goodwill. Plaintiff's evidence, however, does not support the contention that defendant's magazine is harming either plaintiff's webzine or magazine. Plaintiff projects a significant increase in advertising revenue in the webzine, and shows a significant increase in readership even since defendant has begun publishing its magazine. Plaintiff does not show any loss of advertising or readership in either its magazine or webzine. Defendant argues that any name change would be disruptive and expensive. Plaintiff correctly notes that defendant provides no evidence to support this argument, but common sense dictates that it would be

**824**

more disruptive and more expensive than allowing defendant to keep its current name.

Forcing defendant to change its name at this point would essentially allow plaintiff to prevail without ever reaching the merits of the case. If the Court presently requires defendant to change its name, defendant must either stop publication pending trial, or change its name and attempt to convey this change to its consumers. If defendant later prevails on the merits, it would then be forced to choose whether to keep its new name or return to its original name. Such a disruption is more substantial than the injuries that plaintiff has shown it will suffer. Preserving the status quo in this case, until a decision on the merits, will cause less harm to plaintiff than defendant would suffer if the Court currently enjoined defendant. *See Buca, Inc. v. Gambucci's, Inc.*, 18 F.Supp.2d 1193 (D.Kan.1998). The balance of hardship in this case favors defendant.

**D. Public Interest**

■ Plaintiff argues that enjoining defendant serves the public interest because protecting trademarks amounts to protecting consumers. The Court must ensure that consumers will not be confused by the competing products. *Buca*, 18 F.Supp.2d 1193. In this case, however, the Court has already found that there is little likelihood of confusion between plaintiff's products and defendant's magazine. At this stage, the public interest is better served by allowing defendant to continue to publish its magazine until the case reaches trial on the merits. *Id.*

Plaintiff has failed to show that the four factors required for a preliminary injunction weigh heavily and compellingly in its favor. Even under the ordinary burden of proof, the Court finds that plaintiff has not met any of the requisite elements for a preliminary injunction. As a result, the Court will not enjoin defendant's actions at this time.

**IT IS THEREFORE ORDERED** that plaintiff's *Motion For Preliminary Injunc-*

*tion* (Doc # 3) filed August 26, 1998, be and hereby is **DENIED.**

**IT IS HEREBY FURTHER ORDERED** that defendant's *Motion To Strike References To Survey Evidence From Primedia's Post–Hearing Brief* (Doc. # 55) filed October 23, 1998, be and hereby is **SUSTAINED** in part and **DENIED** in part. The Court denies defendant's request to strike references to the evidence from plaintiff's brief, but sustains the motion to the extent that it considers the evidence only for the limited purpose for which it was admitted.[6]

---

**6.** Plaintiff again argues that its survey evidence fits within the residual exception to the hearsay rule. *See* Fed.R.Evid. 807. In the alternative, plaintiff argues that the survey is a public record. *See* Fed.R.Evid. 803(6). While survey evidence

can be admissible in some circumstances, *see Harolds Stores Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir.1996), plaintiff fails to lay a sufficient foundation to fall within either exception that it seeks.